# THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

J.C., a minor, by his parent and proposed )
Next Friend, H.C.; and K.J., a minor, by )
his parent and proposed Next Friend, A.J.,)
                                )
                 Plaintiffs, )
                                )
           v.                  )     Case No. _____
                                )
CURATORS OF THE UNIVERSITY )
OF MISSOURI, )
                                )
 **Serve: Mark A. Menghini** )
        **General Counsel's Office** )
        **321 University Hall** )
        **Columbia, MO 65211** )
                                )
               Defendant. )

## COMPLAINT

Minor Plaintiffs J.C. and K.J., through their respective parents and proposed Next Friends, H.C. and A.J.[1], state the following for their Complaint against Defendant Curators of the University of Missouri:

## PARTIES, JURISDICTION, AND VENUE

1.      J.C. is a transgender boy under the age of 18, a citizen of the United States, and a resident of Boone County, Missouri.

2.      K.J. is a transgender boy under the age of 18, a citizen of the United States, and a resident of Boone County, Missouri.

---

[1] Plaintiffs and their Proposed Next Friends have filed Motions for the Appointment of Next Friends concurrently with this Complaint.

3.      Plaintiffs' sex is a protected class under 42 U.S.C. § 18116.[2]

4.      Both Plaintiffs have been medically diagnosed with gender dysphoria.

5.      Gender dysphoria is a protected disability under 42 U.S.C. § 18116 because it is a physical impairment that substantially limits one or more major life activities, including but not limited to the operation of the endocrine system.

6.      Defendant Curators of the University of Missouri ("University") is the corporate name of the body politic governing the state university system, which has the power to sue and be sued. Mo. Const. Art. IX, sec. 9(a); §§.172.010-.020 RSMo.

7.      The University operates health programs within the state of Missouri and employs hundreds of health care providers at its various healthcare facilities.

8.      The University is a recipient of federal financial assistance through various academic and health programs.

9.      As a recipient of federal financial assistance, the University is subject to the Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a), which prohibits discrimination in any health program or activity on the grounds of sex or disability.

10.     Plaintiffs bring this action against the University for violations of 42 U.S.C. § 18116(a).

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

---

[2] All statutory citations in this complaint refer to the 2023 versions of the United States Code or the Revised Statutes of Missouri.

2

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and Local Rule 3.2(a)(2) because the University's violations of the ACA's antidiscrimination provisions occurred in Boone County, Missouri, which is in the Central Division of the United States District Court for the Western District of Missouri.

## GENERAL ALLEGATIONS RELEVANT TO ALL COUNTS

**A.      *The diagnosis and treatment of gender dysphoria generally***

13.     Nearly all people are designated—by someone other than themselves—as either male or female[3] during gestation or shortly after birth, usually based on the appearance of their external genitalia or other primary sex characteristics, such as the presence or absence of a Y chromosome in their genome.

14.     Such designation is referred to throughout this Complaint as one's *assigned sex* or *sex assigned at birth*.

15.     Most people also develop an internal sense of belonging to, sharing social characteristics of, or more strongly identifying with either the male or female population in general.

16.     An individual's internal sense of being male or female (or occasionally something other than male or female) is referred to throughout this Complaint as one's *gender identity*.

17.     Gender identity is a fundamental aspect of human development, and living in a manner consistent with one's gender identity is critical to a person's health and well-being.

---

[3] Children born with both male and female primary sex characteristics are designated as *intersex*.

3

18.     In most people, gender identity and assigned sex are the same, meaning that one's internal sense of being male or female matches one's primary and secondary sex characteristics, such as reproductive organs, sex chromosomes, the production of estrogen or testosterone, and the development of breasts or an Adam's apple during puberty.

19.     However, there are people whose gender identity does not conform to their sex assigned at birth. For example, a person assigned male at birth because they were born with a penis and testicles may nonetheless have an internal sense of being female, having a greater affinity with women, and feeling more genuine interacting with others *as a woman*.

20.     Those whose gender identity is different from their assigned sex are referred to throughout this Complaint as *transgender*.[4]

21.     Some transgender people realize that their gender identity is different from their assigned sex in early childhood.

22.     For others, the onset of puberty and the resulting physical changes in their bodies lead them to recognize that their gender identity is not aligned with their assigned sex.

23.     And still others do not fully understand or acknowledge the difference between their gender identity and assigned sex until they are well into adulthood.

---

[4] The majority of people whose gender identity matches their assigned sex are sometimes referred to as *cisgender*. The prefixes *cis-* and *trans-* are used in chemistry to differentiate between molecules in which groups of atoms are clustered on the same side as each other (cis) or across from one another (trans). Hence, the term *cis*gender describes a person whose assigned sex and gender identity are *on the same side*, i.e., both male or both female, whereas *trans*gender describes a person whose assigned sex and gender identity are opposite from one another.

4

24.     For many transgender individuals, the incongruity between one's gender identity and assigned sex causes severe emotional distress, a serious medical condition called *gender dysphoria.*

25.     Gender dysphoria is recognized by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR) (DSM-5 released in 2013 and DSM-5-TR released in 2022); by the World Health Organization in its International Classification of Diseases, which is the diagnostic and coding compendium for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

26.     To be diagnosed with gender dysphoria per the DSM-5, the experience of incongruity between one's gender identity and assigned sex must have persisted for at least six months and must be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

27.     Untreated gender dysphoria often intensifies with time. The longer an individual goes without adequate treatment, the greater the risk of debilitating anxiety, severe depression, self-harm, and suicide.

28.     Fortunately, there are generally recognized and effective treatments— sometimes referred to as *gender-affirming care* or *gender-transition care*—that can ameliorate or eliminate the distress of gender dysphoria by helping transgender people to live in a manner fully consistent with their gender identity.

29. Gender-affirming care is an individualized multistep process, which may include social, legal, and/or medical transitions.

30. Social transition refers to living in accordance with one's gender identity in all aspects of one's life. For a transgender man (assigned female at birth), social transition can include wearing typically male attire, using a male name and pronouns, and interacting with other people *as a man*.

31. Legal transition refers to aligning one's legal identity with one's gender identity by changing one's name—from a birth name associated with one's assigned sex (e.g., Stephanie) to a variant more commonly associated with one's gender identity (e.g., Stephen) or an entirely new name (e.g., Samuel)—and sex on one's driver's license, birth certificate, and other forms of identification.

32. Medical transition refers to a variety of medical interventions to bring the sex-specific characteristics of one's body into alignment with one's gender identity.

33. The World Professional Association for Transgender Health ("WPATH") has issued Standards of Care for the Health of Transgender and Gender Diverse People ("WPATH Standards of Care" or "SOC 8") since 1979. The current version is SOC 8, published in 2022.[5]

34. The WPATH Standards of Care provide guidelines for multidisciplinary care of transgender individuals, including adolescents and adults, and describe criteria for medical

---

[5] *See* E. Coleman, et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 International Journal of Transgender Health S1, S1-S259 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 (hereinafter "WPATH Standards of Care" or "SOC 8").

6

interventions to treat gender dysphoria—including puberty-delaying medication, hormone treatment, and surgery when medically indicated—for adolescents and adults.

35.     The SOC 8 is based upon a rigorous and methodological evidence-based approach. Its recommendations are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options, as well as expert consensus. The SOC 8 incorporates recommendations on clinical practice guideline development from the National Academies of Medicine and the World Health Organization.

36.     The SOC 8's recommendations were graded using a modified GRADE (Grading of Recommendations, Assessment, Development, and Evaluations) methodology considering the available evidence supporting interventions, risks and harms, and feasibility and acceptability.

37.     A clinical practice guideline from the Endocrine Society (the "Endocrine Society Guidelines") similarly provides protocols for the medically necessary treatment of gender dysphoria, similar to those outlined in the WPATH Standards of Care.[6]

38.     The guidelines for the treatment of gender dysphoria outlined in the WPATH Standards of Care and in the Endocrine Society Guidelines are comparable to guidelines that medical providers use to treat other conditions.

39.     These clinical practice guidelines of WPATH and the Endocrine Society are widely accepted as best practices for the treatment of adolescents and adults diagnosed with

---

[6] *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society\* Clinical Practice Guideline,* 102 J. Clinical Endocrinology & Metabolism 3869, 3875 (2017), https://academic.oup.com/jcem/article/102/11/3869/ 4157558 (hereinafter "Endocrine Society Guidelines").

7

gender dysphoria and have been recognized as authoritative by leading medical organizations, including the American Academy of Pediatrics, American Medical Association, Academy of Child & Adolescent Psychiatrists, American Psychiatric Association, Pediatric Endocrine Society, and Endocrine Society, among others, all of which agree that medical treatment of gender dysphoria is safe, effective, and medically necessary for many adolescents suffering from gender dysphoria.

40.     Guidance to clinicians differs depending on whether the treatment is for a prepubescent person, an adolescent, or an adult.

41.     In every case, the precise treatment recommended for gender dysphoria will depend upon the person's individualized needs.

42.     The WPATH Standards of Care and the Endocrine Society Guidelines, do not recommend medical transition (other than mental health counseling) for anyone before the onset of puberty.

43.     Gender affirming care for prepubescent children is generally limited to social and legal transitioning, such as adopting a new name and pronouns, wearing clothes that feel more appropriate to one's gender identity, and changing one's hairstyle.

44.     However, medical intervention may become necessary and appropriate as transgender children reach puberty.

### *Puberty-Delaying Treatment*

45.     Puberty often exacerbates the sense of incongruity between transgender adolescents' assigned sex and gender identity, leading to even greater emotional distress.

8

46. For these adolescents, puberty-delaying medication can minimize and potentially prevent the heightened gender dysphoria and durable, often permanent, unwanted physical changes that puberty causes.

47. Puberty-delaying treatment has been shown to be safe and effective at treating gender dysphoria in adolescents.

48. Puberty-delaying treatment typically involves the administration gonadotropin-releasing hormone (GnRH) agonists, which pause a person's endogenous puberty at the stage of pubertal development that the person is in at the time of treatment.

49. For transgender girls, this treatment pauses the physiological changes typical of male puberty and prevents the development of associated secondary sex characteristics like facial hair and a pronounced "Adam's apple." It also prevents the deepening of the young person's voice and genital growth.

50. For transgender boys, puberty-delaying treatment prevents menstruation and the development of breasts.

51. The use of these interventions after the onset of puberty can eliminate or reduce the medical need for surgery later in life.

52. Under the Endocrine Society Guidelines, transgender adolescents may be eligible for puberty-delaying treatment if:

- A qualified mental health professional has confirmed that:

  - the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria;

  - gender dysphoria worsened with the onset of puberty;

9

- any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and

- the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment.

○ The adolescent:

- has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility; and

- has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable law) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

○ And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

- agrees with the indication for GnRH agonist treatment;
- has confirmed that puberty has started in the adolescent; and
- has confirmed that there are no medical contraindications to GnRH agonist treatment.

53.   Similarly, the WPATH Standards of Care recommend that health care professionals assessing transgender adolescents recommend the provision of puberty-delaying medications as treatment only when: (a) the adolescent meets the necessary diagnostic criteria; (b) the experience of gender incongruence is marked and sustained over time; (c) the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; (d) the adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and treatment have been addressed; (e) the adolescent has been informed of the reproductive effects,

10

including effects on fertility, and these have been discussed in the context of the adolescent's stage of pubertal development; and (f) the adolescent has reached Tanner stage 2 of puberty for pubertal suppression to be initiated.

54.     The WPATH Standards of Care further recommend that health care professionals working with transgender adolescents undertake a comprehensive biopsychosocial assessment of the adolescent prior to initiating any medical treatment, and that this be accomplished in a collaborative and supportive manner.

55.     If gender-affirming hormones are prescribed to initiate hormonal puberty consistent with gender identity after puberty-delaying treatment has been received, transgender adolescents will develop secondary sex characteristics typical of peers with their gender identity.

56.     On its own, puberty-delaying treatment does not permanently affect fertility.

57.     Because puberty-delaying treatment followed by gender-affirming hormone therapy can affect fertility, patients are counseled about the risks and benefits of treatment and provided information about fertility preservation.

58.     Puberty-delaying treatment is reversible. If such treatment is stopped and no gender-affirming hormone therapy is provided, there are no lasting effects of the treatment. Endogenous puberty resumes consistent with assigned sex, and patients undergo puberty on a timeline typical of their peers.

59.     If gender-affirming hormone treatment is provided after puberty-delaying treatment, patients undergo puberty consistent with their gender identity on a timeline typical of their peers.

11

60.     A significant body of scientific research shows that puberty-delaying medications are safe, effective, and help improve psychological functioning and quality of life in transgender adolescents.

### *Hormone Replacement Therapy*

61.     For some transgender adolescents and adults, it may be medically necessary and appropriate to treat gender dysphoria with gender-affirming hormone replacement therapy ("HRT").

62.     For transgender boys and men, HRT involves treatment with testosterone.

63.     For transgender girls and women, HRT involves treatment with testosterone suppression and estrogen.

64.     Under the Endocrine Society Guidelines, transgender adolescents may be eligible for gender-affirming HRT if:

- A qualified mental health professional has confirmed:
  - the persistence of gender dysphoria; and
  - any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment.

- The adolescent:
  - has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);
  - the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to the treatment; and

12

■ has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable laws) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

o And a pediatric endocrinologist or other clinician experienced in pubertal induction:

■ agrees with the indication for sex hormone treatment; and

■ has confirmed that there are no medical contraindications to sex hormone treatment.

65.    As with puberty-delaying medications, the WPATH Standards of Care recommend that health care professionals assessing transgender adolescents only recommend the provision of gender-affirming hormones as treatment when: (a) the adolescent meets the necessary diagnostic criteria; (b) the experience of gender incongruence is marked and sustained over time; (c) the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; (d) the adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and treatment have been addressed; and (e) the adolescent has been informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

66.    Again, a comprehensive biopsychosocial assessment of the adolescent prior to initiating any medical treatment is recommended.

13

67. HRT can have significant masculinizing or feminizing effects and can assist in bringing a transgender patients' secondary sex characteristics into alignment with their gender identities.

68. Gender-affirming HRT does not necessarily result in a loss of fertility, and many individuals treated with hormone therapy can and do still biologically conceive children.

69. As with all medications that could affect fertility, transgender adolescents and their parents or guardians are counseled on the potential risks of the medical intervention by their medical professionals, and treatment is only initiated where the medical professionals find it is indicated and the parents and adolescents are properly informed and consent/assent to the care.

70. Adolescents who first receive treatment later in puberty and are treated only with gender-affirming HRT (and not puberty-delaying treatment) also go through a hormonal puberty consistent with their gender identity. However, by then they will have already undergone durable and often permanent physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy or even surgery later in life.

71. Decades of clinical experience and research have shown gender-affirming hormone therapy to be safe and effective at treating gender dysphoria in adolescents and adults.

14

*Surgery*

72.     In addition to hormone therapy, some transgender adults—particularly those who went through endogenous puberty consistent with their sex assigned at birth—may eventually undergo gender-confirming surgical care to align their primary or secondary sex characteristics with their gender identity.

73.     Surgical procedures (such as vaginoplasty, phalloplasty, hysterectomy, gonadectomy, mammoplasty, and mastectomy) permanently replace the physical characteristics of one's assigned sex with the physical features of one's gender identity for the purpose of treating gender dysphoria.

74.     Surgical interventions are beyond the scope of this lawsuit.

**B.     J.C.'s diagnosis and initial treatment for gender dysphoria**

75.     J.C. was assigned female at birth based on physical appearance.

76.     Accordingly, J.C.'s parents gave their child a feminine name, referred to J.C. using feminine pronouns, and bought clothing typical for female infants.

77.     Throughout early childhood, J.C. felt different from other girls at school and uncomfortable behaving the way other girls did.

78.     The onset of menstruation and breast development during puberty made J.C.'s body seem even more alien and caused severe anxiety and depression.

79.     J.C. started seeing therapist in seventh grade but, like many transgender children, did not have the language to describe what was wrong.

80.     When the Covid-19 Pandemic hit, J.C. stopped going to therapy and sank deeper into depression.

15

81.     Things continued to get worse until one day in early December 2020, something clicked.

82.     For the first time, J.C. was able to articulate that *he was a boy*.

83.     Within a few days, J.C. told his closest friends that his gender identity was male.

84.     On December 16, 2020, he told his parents.

85.     J.C. quickly changed the way he dressed, started calling himself by a different name, and began living outwardly as a 14-year-old boy.

86.     He changed his name and gender on school records when classes started back up in January 2021.

87.     He got a prescription for birth control bills from his family doctor to prevent further menstruation.

88.     In March 2022, he legally changed his name.

89.     In April 2022, J.C.'s parents took him to see a University doctor—who will be referred to as *Dr. M.* throughout this Complaint—to ask about gender-affirming care.

90.     Dr. M. diagnosed J.C. with persistent gender dysphoria and discussed treatment options with him and his parents.

91.     On information and belief, Dr. M. determined—based on her training and best medical judgment—that HRT was both appropriate and medically necessary to treat J.C.'s gender dysphoria.

92.     In her notes from that initial visit, Dr. M. documented that she reviewed the risks and benefits of HRT with J.C. and his parents, including fertility preservation measures;

16

that J.C. had the support of his parents and was emotionally ready to begin HRT; that J.C. had the mental capacity to give informed consent to HRT; and that he and his parents had, in fact, given informed consent to HRT.

93. Consistent with both the Endocrine Society Guidelines and the WPATH Guidelines, Dr. M. ordered baseline labs for J.C. and started him on testosterone injections—20mg per week for one month, then increasing to 40mg/week—and scheduled a follow-up visit in two months.

94. In June 2022, Dr. M. increased J.C.'s testosterone injections to 60mg per week for one month, then to 80mg per week for the next three months.

95. Dr. M. saw J.C. again in September 2022, ordering labs for medication monitoring, increasing his testosterone to 100mg per week, and scheduling another follow up visit in six months.

96. Dr. M. also discontinued J.C.'s prescription for birth control pills because he had been taking testosterone for six months by this point, which would prevent further menstruation.

97. At J.C.'s next appointment in March 2023, Dr. M. ordered labs, continued his testosterone injections at 100mg per week, and scheduled his next follow-up for six months.

98. On information and belief, Dr. M. genuinely believes—based on her training and best medical judgment—that J.C. should continue receiving HRT to treat gender dysphoria, and she would have refilled his prescriptions for HRT at his follow-up visit in September 2023 had she been permitted to so.

17

### C. K.J.'s diagnosis and initial treatment for gender dysphoria

99.    K.J. was assigned female at birth based on physical appearance and given a feminine name.

100.    At age four, however, K.J. told his mother that there was "something wrong," and that he felt like he was "born into the wrong body."

101.    K.J. cut his hair nine inches when he started kindergarten so he would not feel like he was pretending to be someone he was not.

102.    Strangers often assumed he was a boy based on his appearance and demeanor.

103.    K.J. still used his birth name and assigned sex at school, but he chose a more masculine-sounding name to use at home.

104.    K.J. began self-harming his hands in first grade as the incongruity between his gender identity and assigned sex became increasingly difficult to ignore.

105.    When he started second grade in a virtual classroom due to the Covid-19 Pandemic, K.J. decided to introduce himself as a boy to his teachers and classmates on Zoom and used his preferred masculine name.

106.    K.J. legally changed his name in November 2022.

107.    As K.J. embraced his male gender identity at school, his health and happiness improved, and he stopped self-harming.

108.    By age nine, K.J. appeared to be entering puberty early.

109.    His mother and stepfather worried that the onset of menstruation and other feminizing changes in K.J.'s appearance would undo the social and emotional progress he had made since coming out as transgender.

18

110.    In September 2022, K.J.'s parents took him to see an endocrinologist at University Hospital—who will be referred to as *Dr. G.* throughout this Complaint—to discuss pubertal suppression.

111.    Dr. G. diagnosed K.J. with gender dysphoria and precocious puberty.

112.    On information and belief, Dr. G. determined—based on his training and best medical judgment—that puberty-delaying medication was medically necessary to treat K.J. for gender dysphoria and precocious puberty.

113.    Dr. G. informed K.J. and his parents about the risks and benefits of puberty-delaying medication, which is reversible by itself but may lead to lost fertility if followed by HRT.

114.    Starting K.J. on puberty-delaying medication would allow time for K.J. to mature further before considering whether to proceed with HRT later in adolescence.

115.    Dr. G. determined that K.J. was emotionally stable and mature enough to begin treatment and obtained informed consent for K.J.'s parents.

116.    Consistent with both the Endocrine Society Guidelines and the WPATH Guidelines, Dr. G. prescribed GnRH agonist injections—monthly at first, then once every six months.

117.    On information and belief, Dr. G. genuinely believes—based on his training and best medical judgment—that K.J. should continue receiving injections of GnRH agonists to treat his gender dysphoria and delay puberty until K.J. is ready to give informed consent to gender-affirming HRT in a few more years.

19

118. On information and belief, Dr. G. would have refilled K.J. prescriptions for puberty delaying medication at his follow-up visit in September 2023 if he had been permitted to so.

**D.     *SB 49's prohibitions and limitations***

119. During the 2023 legislative session, the Missouri General Assembly adopted, and Governor Mike Parson signed into law, Senate Bill 49 ("SB 49"), which prohibits "health care providers" from "prescribe[ing] or administ[ing] cross-sex hormones or puberty-blocking drugs for the purpose of a gender transition for any individual under eighteen years of age." Mo. Rev. Stat. § 191.1720.4(1).

120. Reflecting a last-minute compromise with the bill's opponents, SB 49 contains two important limitations: the prohibition against gender-affirming care for minors (a) "shall expire on August 28, 2027"; and (b) "shall not apply to … any individual … who was prescribed or administered such hormones or drugs prior to August 28, 2023." Mo. Rev. Stat. § 191.1720.4(2)-(3).

121. Proponents of SB 49 claimed that the latter "grandfather clause" would permit minors who had already begun gender-affirming care to continue treatment.

122. Many transgender minors and their parents scrambled to begin gender-affirming medical care before the law went into effect to take advantage of SB 49's grandfather clause.

**E.**     **The University discontinues J.C.'s and K.J.'s gender-affirming care despite their doctors' best medical judgment and SB 49's "grandfather clause."**

123.     On or about August 28, 2023, the University announced to the Media that it would no longer prescribe or administer puberty-delaying drugs or HRT to transgender minors for the purpose of gender transition.

124.     Many parents of transgender minors receiving gender-affirming care from University doctors—including those who had begun treatment shortly before August 28 in reliance on SB 49's grandfather clause—learned about the discontinuation of their children's medical treatment for the first time when they read about it in the newspaper.

125.     The University's policy change has nothing to do with its doctors' medical judgment or the best interests of its transgender patients.

126.     On information and belief, Dr. M. believes that HRT is still indicated and medically necessary to treat J.C.'s gender dysphoria, and she would continue to prescribe HRT for J.C. if she were not expressly prohibited from doing so by the University.

127.     As of this filing, J.C. has not been able to find another health care provider in Missouri willing to refill his prescription for testosterone injections.

128.     He will exhaust his current supply of testosterone by February 2024.

129.     On information and belief, Dr. G. believes that puberty-delaying medication is still indicated and medically necessary to treat K.J.'s gender dysphoria, and he would continue to prescribe that medication for K.J. if he were not expressly prohibited from doing so by the University.

130.     As of this filing, K.J. has not been able to find another health care provider in Missouri willing to refill his prescription for GnRH agonists.

21

131.     He will exhaust his current supply puberty-delaying medication in February

2024.

**F.      Section 1557 of the ACA prohibits discrimination in healthcare based on sex or disability.**

132.     Section 1557 of the Patient Protection and Affordable Care Act ("ACA")

provides, in relevant part:

> an individual shall not, on the ground prohibited under … title
> IX of the Education Amendments of 1972 (20 U.S.C. 1681 et
> seq.), … or section 794 of Title 29 [the Rehabilitation Act of
> 1973], be excluded from participation in, be denied the benefits
> of, or be subjected to discrimination under, any health program
> or activity, any part of which is receiving Federal financial
> assistance ….

42 U.S.C. § 18116(a).

133.     Title IX of the of the Education Amendments of 1972 ("Title IX") provides,

in relevant part:

> No person in the United States shall, *on the basis of sex*, be
> excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any education program or
> activity receiving Federal financial assistance….

20 U.S.C. § 1681(1) (emphasis added).

134.     Similarly, the Rehabilitation Act of 1973 provides, in relevant part:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 705(20) of this title, shall, *solely by*
> *reason of her or his disability*, be excluded from the participation in,
> be denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial
> assistance….

29 U.S.C. § 794.

135.    Section 705(20) of Title 29, in turn, defines "individual with a disability" to mean "any person who has a disability as defined in section 12102 of Title 42," which is also known as the Americans with Disabilities Act ("ADA").

136.    Finally, the ADA defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

137.    Incorporating the foregoing provisions from Title IX and the Rehabilitation Act/ADA, Section 1557 of the ACA prohibits the University (a recipient of federal financial assistance) from discriminating against Plaintiffs in the provision of health care based on their sex or disability.

138.    The ACA further provides that the "enforcement mechanisms provided for and available under [Title IX or the ADA] shall apply for purposes of violations" of § 1557.

**G.    The University's policy decision to discontinue gender-affirming care for minors discriminates on the bases of sex and disability in violation of § 1557.**

139.    As a matter of policy, the University no longer permits its doctors to prescribe or administer puberty-delaying medication or HRT to *transgender* minors for the treatment of *gender dysphoria*.

140.    However, on information and belief, the University does still permit its doctors to prescribe or administer these same drugs to *cisgender* minors for the treatment of other conditions, such as precocious puberty or adolescent gynocomastia.

23

141. Whether the University permits its doctors to prescribe puberty-delaying medication or HRT to minor patients depends *not* on whether the minor was already receiving treatment—as SB 49's grandfather clause was intended to permit—but rather on the medical condition being treated and whether the medication's intended effect is congruent with the patient's sex assigned at birth and gender identity.

142. For example, University policy allows its doctor to prescribe testosterone HRT to prevent breast development in *cisgender* boys but not to prevent breast development in *transgender* boys.

143. Such a policy discriminates on the basis of transgender status.

144. Similarly, University policy allows its doctors to prescribe puberty-delaying medication to prevent or halt menstruation in minors assigned female at birth *if and only if* their gender identity is also female **but not** if it there gender-identity is male.

145. In this regard, University policy discriminates on the basis of gender identity.

146. Finally, University policy allows its doctors to prescribe puberty-delaying medication and HRT to treat precocious puberty and gynocomastia, respectively, *but not to treat gender dysphoria.*

147. As such, University policy discriminates against minors with gender dysphoria.

148. Because gender dysphoria is a physical impairment that substantially limits one or more major life activities, including the operation of the endocrine system, discrimination based solely on that diagnosis is discrimination *based on a disability.*

149. Consequently, University policy also discriminates on the basis of disability.

24

**H. The University's decision to terminate ongoing gender-affirming care for all minors will cause irreparable harm to J.C. and K.J.**

150. If the doctors who started their gender-affirming care are not permitted to continue it, the chances that J.C. and K.J. will find other doctors in Missouri to take over their treatment are slim to nil.

151. J.C. and K.J. will either have to find new doctors in another state at considerable expense and inconvenience to themselves and their parents—which hasn't happened thus far—or they will have to forgo further gender-affirming care until they turn 18.

152. If J.C. discontinues the treatment begun by Dr. M., he will start to lose the secondary sex characteristics consistent with his male gender identity that have developed over the 18 months (such as facial hair and increased upper body strength) and revert to secondary sex characteristics consistent with his assigned sex, including renewed menstruation and breast development.

153. After a year of watching his body start to reflect his male gender identity, the sudden reversion to feminine characteristics will be deeply traumatic to J.C.

154. Likewise, without the puberty-delaying medication prescribed by Dr. G., K.J. will enter endogenous puberty consistent with other children assigned female at birth.

155. He will begin menstruating and developing breasts.

156. After the promise of going through puberty *as a boy*, his sudden development female characteristics will cause K.J. severe emotional and physical distress.

157.    Absent preliminary injunctive relief, these unwanted changes to their bodies will cause Plaintiffs irreparable physical and psychological harm for which they have no adequate remedy at law.

## COUNT I— DISCRIMINATION IN A HEALTH PROGRAM BASED ON SEX IN VIOLATION OF THE ACA
### 42 U.S.C. § 18116(a)

158.    Plaintiffs incorporate all prior allegations in this Complaint into this Count by reference as though fully set forth herein.

159.    Section 1557 of the ACA prohibits health programs that receive federal financial assistance from discriminating on the basis of sex.

160.    Under federal law, discrimination on the basis of sex includes discrimination based on gender identity, transgender status, and nonconformity with sex stereotypes.

161.    The University operates health programs and activities through its many hospitals and clinics, including those that employ Drs. M. and G.

162.    The University receives millions of dollars in federal financial assistance every year.

163.    Since August 28, 2023, the University has discriminated against Plaintiffs J.C. and K.J. based on their transgender status and/or their failure to conform to sex stereotypes consistent with their assigned sex.

164.    Specifically, the University has prohibited Dr. M. from renewing J.C.'s prescription for testosterone HRT even though:

          a.  Dr. M. believes testosterone injections are indicated and medically
              necessary to treat J.C.'s gender dysphoria;

26

b. J.C. has been taking testosterone injections for more than 18 months;

c. Dr. M. is legally authorized to prescribe testosterone injections to J.C. under SB 49's "grandfather clause"; and

d. The University does not prohibit Dr. M. from prescribing (or renewing prescriptions of) the same testosterone injections to treat *cisgender* boys—i.e., minors who were assigned *male* at birth and have *male* gender identities—for gynecomastia.

165. Similarly, the University has prohibited Dr. G. from renewing K.J.'s prescription for puberty-delaying GnRH agonists even though:

a. Dr. G. believes GnRH agonists are indicated and medically necessary to prevent K.J. from menstruating until he is old enough to start testosterone HRT injections;

b. K.J. has been taking GnRH agonists for over a year;

c. Dr. G. is legally authorized to prescribe GnRH agonists to K.J. under SB 49's "grandfather clause"; and

d. The University does not prohibit Dr. G. from prescribing (or renewing prescriptions of) GnRH agonists to treat *cisgender* girls—i.e., minors who were assigned *female* at birth and have *female* gender identities—for precocious puberty.

166. Plaintiffs' sex is a motivating factor in the in the University's refusal to continue their treatment for gender dysphoria.

27

167.    As a direct and proximate result of the University's refusal to renew prescriptions necessary to treat Plaintiffs' gender dysphoria, Plaintiffs have suffered and will continue to suffer injury, including but not limited to the costs of searching for alternative health care providers out of state, and the costs of filling prescriptions outside their insurance networks—assuming they are able to find new doctors and refill their prescriptions at all.

168.    If they cannot find new healthcare providers out of state before running out of prescription refills in February 2024, Plaintiffs will also suffer irreparable harm from the interruption/termination of medically necessary gender-affirming care, including but not limited to the loss of masculine secondary sex characteristics and concomitant reversion to feminine secondary sex characteristics, such as breast development and menstruation, resulting in extreme emotional distress.

169.    Because Plaintiffs cannot recover monetary damages for emotional distress under the ACA, they have no adequate remedy at law.

170.    Preliminary and permanent injunctive relief—prohibiting the University from denying Plaintiffs continued, lawful, and medically necessary gender-affirming care—is necessary to prevent Plaintiffs from suffering such irreparable harm.

171.    Plaintiffs are entitled to their costs and reasonable attorneys' fees.

## COUNT II—DISCRIMINATION IN A HEALTH PROGRAM BASED ON DISABILITY IN VIOLATION OF THE ACA
### 42 U.S.C. § 18116(a)

172.    Plaintiffs incorporate all allegations in this Complaint into this Count by reference as though fully set forth herein.

28

173. Section 1557 of the ACA prohibits health programs that receive federal financial assistance from discriminating on the basis of disability.

174. Gender dysphoria is a disability for purposes of the ACA.

175. The University operates health programs and activities through its many hospitals and clinics.

176. The University receives millions of dollars in federal financial assistance every year.

177. Since August 28, 2023, the University has discriminated against Plaintiffs J.C. and K.J. based on their diagnoses of gender dysphoria.

178. Specifically, the University has prohibited Dr. M. from renewing J.C.'s prescription for testosterone HRT (testosterone injections) even though:

    a. Dr. M. believes testosterone injections are indicated and medically necessary to treat J.C.'s gender dysphoria;

    b. J.C. has been taking testosterone injections for over a year already;

    c. Dr. M. is legally authorized to prescribe testosterone injections to J.C. under SB 49's "grandfather clause"; and

    d. The University does not prohibit Dr. M. from prescribing (or renewing prescriptions of) the same testosterone injections to minors for other medical conditions, such as adolescent gynecomastia.

179. Similarly, the University has prohibited Dr. G. from renewing K.J.'s prescription for puberty-delaying GnRH agonists even though:

29

a.  Dr. G. believes GnRH agonists are indicated and medically necessary to treat K.J.'s gender dysphoria;

b.  K.J. has been taking GnRH agonists for over a year already;

c.  Dr. G. is legally authorized to prescribe GnRH agonists to K.J. under SB 49's "grandfather clause"; and

d.  The University does not prohibit Dr. G. from prescribing (or renewing prescriptions of) GnRH agonists to minors for other medical conditions, such precocious puberty.

e.  Indeed, even though Dr. G. also diagnosed K.J. with precocious puberty in addition to gender dysphoria, he is not allowed to treat K.J.'s precocious puberty with GnRH agonists—as he would other children with the same condition—because K.J. also happens to have gender dysphoria.

180.  Consequently, Plaintiffs' disability is a motivating factor in the University's refusal to continue their treatment for gender dysphoria.

181.  As a direct and proximate result of the University's refusal to renew prescriptions necessary to treat Plaintiffs' gender dysphoria, Plaintiffs have suffered and will continue to suffer injury, including but not limited to the costs of searching for alternative health care providers out of state and the costs of filling prescriptions outside their insurance networks—assuming they are able to find new doctors and refill their prescriptions at all.

182.  If they cannot find new healthcare providers out of state before running out of prescription refills in February 2024, Plaintiffs will also suffer irreparable harm from a termination or interruption of medically necessary gender-affirming care, including but not

limited the loss of masculine secondary sex characteristics and concomitant reversion to feminine secondary sex characteristics, such as breast development and menstruation, resulting in extreme emotional distress.

183.    Because Plaintiffs cannot recover monetary damages for emotional distress under the ACA, they have no adequate remedy at law.

184.    Preliminary and permanent injunctive relief—prohibiting the University from denying Plaintiffs continued, lawful, and medically necessary gender-affirming care—is necessary to prevent Plaintiffs from suffering such irreparable harm.

185.    Plaintiffs are entitled to their costs and reasonable attorneys' fees.

**WHEREFORE**, Plaintiffs pray for judgment in their favor and against Defendant Curators of the University of Missouri, awarding the following relief:

(1)    Preliminary and permanent injunctive relief prohibiting Curators from denying Plaintiffs continued, lawful, gender-affirming medical treatment recommended by their doctors, including refilled prescriptions for GnRH agonists and/or testosterone HRT;

(2)    Compensatory damages;

(3)    Litigation costs and reasonable attorneys' fees;

(4)    Such other relief as the Court deems just and proper.

Respectfully submitted,

**TGH Litigation LLC**

*/s/ J. Andrew Hirth*
J. Andrew Hirth, #57807MO
28 N. Eighth St., Suite 317
Columbia, MO 65201

31

Andy@TGHLitigation.com
Phone: 573 256 2850
Fax: 573 213 2201

Attorneys for Plaintiff