THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| J.C., by his parent and Next Friend, H.C; and K.J., by his parent and Next Friend, A.J., <br><br> Plaintiffs, <br><br> v. <br><br> CURATORS OF THE UNIVERSITY OF MISSOURI, <br><br> Defendant. | Case No. 2:23-cv-04216-MDH |

## PLAINTIFFS' SUGGESTIONS IN SUPPORT
## OF THEIR MOTION FOR PRELIMINARY INJUNCTION

**TGH Litigation LLC**

*/s/ J. Andrew Hirth*
J. Andrew Hirth, #57807MO
28 N. Eighth St., Suite 317
Columbia, MO 65201
Andy@TGHLitigation.com
Phone: 573 256 2850
Fax: 573 213 2201

Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................iii

LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF...........................................1

ARGUMENT....................................................................................................................................1

I.     Plaintiffs will suffer irreparable harm if the medically necessary gender-affirming care they have been receiving from the University for more than a year is discontinued.......................1

II.    Plaintiffs have more than a fair chance of succeeding on the merits of their discrimination claims at trial ...................................................................................................................................3

        A.    The University's policy discriminates based on sex........................................................6

        B.    The University's policy also discriminates based on disability.................................. 10

III.   Both the balance of equities and the public interest favor granting preliminary injunctive relief in this case ............................................................................................................................. 14

REQUEST FOR HEARING........................................................................................................... 15

# TABLE OF AUTHORITIES

Cases

*Ass'n of Cmty. Organizations for Reform Now v. Scott*,
    No. 08-CV-4084-NKL, 2008 WL 2787931 (W.D. Mo. July 15, 2008) ..................1

*Bostock v. Clayton Cnty., Georgia*,
    140 S. Ct. 1731 (2020)........................................................................................6, 8-9

*Boyden v. Conlin*,
    341 F. Supp. 3d 979 (W.D. Wis. 2018) ................................................................ 10

*Brandt by & through Brandt v. Rutledge*,
    47 F.4th 661 (8th Cir. 2022)..............................................................................1-2, 9

*Brooks v. Francis Howell Sch. Dist.*,
    599 F. Supp. 3d 795 (E.D. Mo. 2022) .....................................................................4

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*,
    536 F. Supp. 3d 791 (W.D. Wash. 2021) ......................................................... 5, 10

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    596 U.S. 212 (2022).................................................................................................3

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
    640 F.2d 109 (8th Cir. 1981) (en banc)).................................................................1

*D.M. by Bao Xiong v. Minnesota State High Sch. League*,
    917 F.3d 994 (8th Cir. 2019)...................................................................................3

*Gen. Motors Corp. v. Harry Brown's, LLC*,
    563 F.3d 312 (8th Cir. 2009)................................................................................1-2

*H&R Block Tax Servs. LLC v. Clayton*, No. 4:16-CV-00185-SRB,
    2016 WL 1247205 (W.D. Mo. Mar. 24, 2016) ......................................................1

*Henderson v. Bodine Aluminum, Inc.*,
    70 F.3d 958 (8th Cir. 1995) ....................................................................................2

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005).................................................................................................7

*Joganik v. E. Texas Med. Ctr.*, No. 6:19-CV-517-JCB-KNM,
    2021 WL 6694455 (E.D. Tex. Dec. 14, 2021)........................................................5

*Julia M. v. Scott*,
    498 F. Supp. 2d 1245 (W.D. Mo. 2007).................................................................2

*Kai v. Ross*,
 336 F.3d 650 (8th Cir. 2003) ..................................................................................................2

*M.B. v. Corsi*, No. 2:17-CV-04102-NKL,
 2018 WL 5504178 (W.D. Mo. Oct. 29, 2018) .........................................................................2

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
 970 F.3d 1010 (8th Cir. 2020) ............................................................................................... 14

*Ng v. Bd. of Regents of Univ. of Minnesota*, No. 21-CV-2404 (SRN/BRT),
 2022 WL 602224 (D. Minn. Mar. 1, 2022) ..............................................................................4

*Ohlensehlen v. Univ. of Iowa*,
 509 F. Supp. 3d 1085 (S.D. Iowa 2020) ..................................................................................4

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*,
 530 F.3d 724 (8th Cir. 2008) ........................................................................................... 3-4, 10

*Religious Sisters of Mercy v. Becerra*,
 55 F.4th 583 (8th Cir. 2022) ................................................................................................ 5-6

*Rowles v. Curators of Univ. of Missouri*,
 983 F.3d 345 (8th Cir. 2020) ...................................................................................................5

*Scott v. St. Louis Univ. Hosp.*,
 600 F. Supp. 3d 956 (E.D. Mo. 2022) ........................................................................... 5, 7, 10

*Singh v. Berger*,
 56 F.4th 88 (D.C. Cir. 2022) ................................................................................................. 14

*Univ. of Texas v. Camenisch*,
 451 U.S. 390 (1981) .................................................................................................................1

*Williams v. Kincaid*,
 45 F.4th 759 (4th Cir. 2022) ............................................................................................. 12-13

Statutes

20 U.S.C. 1681 ............................................................................................................................ 5-7

29 U.S.C. 794 ............................................................................................................................ 5, 11

42 U.S.C. § 2000e-1(a) ....................................................................................................................7

42 U.S.C. § 18116(a) ................................................................................................................ 5, 11

42 U.S.C. § 12101 .................................................................................................................. 11, 13

Minor Plaintiffs J.C. and K.J., through their respective Next Friends, H.C. and A.J., submit the following Suggestions in Support of their Motion for Preliminary Injunction filed contemporaneously herewith and incorporated into these Suggestions by reference:

**LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF**

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In deciding whether to issue a preliminary injunction, courts in the Eighth Circuit consider the four "*Dataphase* factors": "[1] the threat of irreparable harm to the movant, [2] the likelihood that the movant will succeed on the merits, [3] the balance between the harm to the movant and injury that an injunction would inflict on other parties, and [4] the public interest." *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

"A preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. Accordingly, "the court may properly consider evidence that would ordinarily be inadmissible, such as hearsay, in support of granting a preliminary injunction." *H&R Block Tax Servs. LLC v. Clayton*, No. 4:16-CV-00185-SRB, 2016 WL 1247205, at *1 (W.D. Mo. Mar. 24, 2016); *see also Ass'n of Cmty. Organizations for Reform Now v. Scott*, No. 08-CV-4084-NKL, 2008 WL 2787931, at *3 n. 5 (W.D. Mo. July 15, 2008) (considering hearsay evidence at preliminary injunction hearing).

**ARGUMENT**

**I.    Plaintiffs will suffer irreparable harm if the medically necessary gender-affirming care they have been receiving from the University for more than a year is discontinued.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because [the party's] injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v.*

1

*Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The Eighth Circuit held that "danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury." *Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003); *see also Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961 (8th Cir. 1995) ("It is hard to imagine a greater harm than losing a chance for potentially life-saving medical treatment."); *M.B. v. Corsi*, No. 2:17-CV-04102-NKL, 2018 WL 5504178, at *5 (W.D. Mo. Oct. 29, 2018) ("Danger to health also generally warrants a presumption of irreparable harm."); *Julia M. v. Scott*, 498 F. Supp. 2d 1245, 1248–49 (W.D. Mo. 2007) ("A potential lapse in medical coverage for the children … is an irreparable harm of the highest order.").

The University's decision to discontinue Plaintiffs' gender-affirming care more than a year into the courses of treatment prescribed for them by University doctors threatens irreparable physical and emotional harm for which Plaintiffs have no adequate remedy at law. K.J. has been taking GnRH agonists prescribed by his University doctor since September 2022. These medications have kept K.J. from menstruating or developing breasts until he is old enough to start testosterone injections and undergo male puberty consistent with boys his age.

Since August 28, 2023, however, the University has prohibited K.J.'s doctor from refilling K.J.'s prescription for GnRH agonists. Unable thus far to find any other Missouri healthcare providers willing to take over his care, Plaintiff will run out of prescription medication by February 2024. If K.J. stops taking the GnRH agonists he has taken for more than a year without replacing them with testosterone injections—the next step in the gender-transition treatment recommended by his doctor—he will enter endogenous puberty consistent with children his age assigned female at birth. In relatively short order, K.J. will start menstruating and developing breasts, exacerbating the symptoms of gender dysphoria for which he sought treatment from the University in the first place and causing irreparable harm. *See Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), aff'd sub nom. *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (statute terminating

2

minor plaintiffs' access to necessary gender-affirming medical treatment threatens irreparable physical and psychological harm).

Moreover, assuming Plaintiffs will prevail on the merits of their sex- and disability-discrimination claims under the Affordable Care Act, they have no adequate remedy at law. They cannot recover any of the time during which the University unlawfully denied them necessary medical treatment. Nor can they undo any of the negative effects delaying treatment may have on their physical or psychological well-being. Finally, they cannot recover monetary damages for the increased severity or duration of the emotional distress occasioned by unlawfully delayed treatment. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022) (holding emotional distress damages are not recoverable under Spending Clause antidiscrimination statutes, including Title IX and section 794 of Title 29). Consequently, preliminary injunctive relief is necessary to preserve the *status quo ante* and prevent Plaintiffs from suffering irreparable harm until their claims can fully adjudicated at trial.

## II. Plaintiffs have more than a fair chance of succeeding on the merits of their discrimination claims at trial.

The Eighth Circuit has identified two different standards for weighing a movant's probability of success on the merits in preliminary injunction cases. *See D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994 (8th Cir. 2019). "The first, which applies in most instances, directs the district court to ask whether the party requesting a preliminary injunction has a 'fair chance of prevailing.'" *Id.* at 999 (citing *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). "This fair-chance standard does not require the moving party to show a greater than fifty per cent likelihood that he will prevail on the merits." *Id.* (internal quotation marks and citations omitted). The second, "more rigorous standard" calls on the district court to determine whether the movant is more "likely to prevail" than not. *Id.* at 999-1000. The

3

likely-to-prevail standard applies only when "a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." *Id.*

The Eighth Circuit has "emphasize[d] that district courts should still apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes." *Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). For example, a party seeking to enjoin a school board policy need only show a "fair chance of prevailing" because "unlike federal, state, and municipal governments, the board has no horizontal separation of powers; that is, the board is a policymaking body unto itself, without the check or balance that the executive branch serves for the legislative, and vice versa." *Brooks v. Francis Howell Sch. Dist.*, 599 F. Supp. 3d 795, 802 (E.D. Mo. 2022); *see also Ng v. Bd. of Regents of Univ. of Minnesota*, No. 21-CV-2404 (SRN/BRT), 2022 WL 602224, at *7 (D. Minn. Mar. 1, 2022), aff'd, 64 F.4th 992 (8th Cir. 2023) (applying "fair chance" standard to preliminary injunction motion in Title IX case challenging a public university's athletic policy); *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1094 (S.D. Iowa 2020) (same).

In this case, Plaintiffs are not challenging a duly enacted state statute. Rather, they have moved to enjoin a state university's *policy* decision to deny medically necessary gender-affirming care to all minors even if such treatment is expressly permitted under SB 49's grandfather clause. Because the Board of Curators is "a policymaking body unto itself, without the check or balance that the executive branch serves for the legislative, and vice versa," its policy decisions are not entitled to the same deference as "presumptively reasoned democratic processes." *Rounds*, 530 F.3d at 732. Thus, Plaintiffs need only show a "fair chance of prevailing on the merits" to satisfy the second *Dataphase* factor.

In their Complaint, Plaintiffs assert two causes of action under § 1557 of the Affordable Care Act, which provides "that a federally funded or administered health program or activity is

4

prohibited from denying benefits to, or subjecting to discrimination, an individual 'on [a] ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)" or Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 588 (8th Cir. 2022). In turn, Title IX prohibits discrimination against any person "on the basis of sex," 20 U.S.C. § 1681(a), and the Rehabilitation Act prohibits discrimination against an "individual with a disability … solely by reason of her or his disability." 29 U.S.C. § 794. To prevail on their claims for unlawful discrimination under Section 1557 of the ACA, Plaintiffs must prove three elements: (1) Defendant University is a health program that receives federal financial assistance; (2) Plaintiffs were excluded from participation in or denied the benefit of the program; and (3) Plaintiffs' exclusion was on a ground prohibited by" either Title IX (sex) or the Rehabilitation Act (disability). *Scott v. St. Louis Univ. Hosp.*, 600 F. Supp. 3d 956, 964 (E.D. Mo. 2022); *see also C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, 536 F. Supp. 3d 791, 796 (W.D. Wash. 2021) (same elements); *Joganik v. E. Texas Med. Ctr.*, No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *11 (E.D. Tex. Dec. 14, 2021), report and recommendation adopted, No. 6:19-CV-00517, 2022 WL 243886 (E.D. Tex. Jan. 25, 2022) (same elements). As they have alleged in their Complaint and will be able to show at a hearing on their motion for preliminary injunction, Plaintiffs have more than a fair chance of prevailing on their two ACA claims for sex and disability discrimination.

First, the University cannot dispute that it operates several "health programs," including University Hospital, the Cosmopolitan International Diabetes and Endocrinology Center, and the Battle Avenue Family Medicine Clinic. Nor can the University dispute that it receives federal financial assistance. *See Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 355 (8th Cir. 2020) ("It is undisputed that the University receives federal funding.").

Second, the University cannot deny that it has excluded Plaintiffs from, or denied Plaintiffs a benefit of, its health programs. Although J.C. and K.J. have been receiving testosterone injunctions and puberty-delaying medication, respectively, from their University doctors for more than a year, the University publicly announced on August 28, 2023, that it would no longer provide those medication to minors for the purpose of gender transition, including those already receiving such care prior to that date. *See* "MU Health Care goes beyond law limiting gender-affirming care," COLUMBIA MISSOURIAN, August 28, 2023, https://www.columbiamissourian.com/news/local/mu-health-care-goes-beyond-law-limiting-gender-affirming-care/article_14bc38de-45bf-11ee-8baa-f33a07d607b1.html (last accessed December 7, 2023). Consistent with this policy, Plaintiffs' University doctors have not renewed their prescriptions since August 28.

The only remaining issue is whether the University is prohibiting its doctors from refilling or renewing J.C.'s and K.J.'s prescriptions for testosterone and GnRH agonists "on a ground prohibited by" either Title IX (sex) or the Rehabilitation Act (disability). Here, Plaintiffs have more than a fair chance of proving both at least one of their claims trial.

**A. The University's policy discriminates based on sex.**

Section 1557 of the ACA prohibits the University "from denying benefits to, or subjecting to discrimination, an individual 'on [a] ground prohibited under ... title IX….'" *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 588 (8th Cir. 2022). In turn, Title IX prohibits discrimination against any person "on the basis of sex," 20 U.S.C. § 1681(a). In the context of Title VII, the Supreme Court has held that "discrimination based on … transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1747 (2020) ("In Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize

6

today a necessary consequence of that legislative choice: An employer who fires an individual merely for being gay or transgender defies the law.").

"Title IX, and by extension the ACA, is a much broader prohibition on discrimination than Title VII." *Scott v. St. Louis Univ. Hosp.*, 600 F. Supp. 3d 956, 964 (E.D. Mo. 2022). Title VII prohibits discrimination "against any individual ... because of *such individual's* race, color, religion, sex, or national origin." *Id.* (quoting 42 U.S.C. § 2000e-1(a)). Title IX has no such limitations. Rather, it states "[n]o person in the United States shall, on the basis of sex ... be subjected to discrimination ...." 20 U.S.C. § 1681. In *Jackson v. Birmingham Bd. of Educ.*, for example, the Supreme Court held that a male coach disciplined for complaining that his girls' basketball team received less funding than the boys' team could bring a claim for sex discrimination under Title IX. 544 U.S. 167 (2005). In reaching its conclusion, the Court contrasted Title VII and Title IX: "Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition. By contrast, Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute." *Jackson.*, 544 U.S. at 175. Accordingly, the Court concluded that "when a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id.* at 174. Although the Supreme Court has yet to consider whether discrimination against a person for being transgender violates Title IX, "[i]t would be logically inconsistent with *Bostock* to find that Title IX permits discrimination for being transgender." *Scott v. St. Louis Univ. Hosp.*, 600 F. Supp. 3d 956, 965 (E.D. Mo. 2022).

Here, the University has chosen to deny Plaintiffs certain medications based on their sex and transgender status. Although the University no longer permits its doctors to prescribe GnRH agonists to delay puberty in K.J. and other *trans*gender children, it routinely permits them to

prescribe the same medication to delay puberty in *cis*gender children.[1] For example, a nine-year-old cisgender girl seeking treatment for precocious puberty at the University's Pediatric and Adolescent Specialty Clinic may still obtain a prescription for a GnRH agonist if her doctor believes it is medically warranted. Like K.J., this hypothetical child was assigned female at birth. Like K.J., her doctor believes GnRH agonist therapy is medically necessary to treat a serious medical condition. While the University will permit its doctors to prescribe a GnRH agonist in that case, it will not do so in K.J.'s case because K.J. has a male gender identity. And because "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex," *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741 (2020), withholding a GnRH agonist from K.J. based on his transgender status is discrimination based on sex.

Similarly, although the University no longer permits its doctors to prescribe testosterone to J.C., it routinely permits them to prescribe the same injections to *cisgender* boys with constitutional delay of growth and puberty (stunted growth due to delayed puberty) or hypogonadism (failure of the testes to produce testosterone).[2] A cisgender adolescent male seeking treatment for either of those conditions at the University's Battle Avenue Family Medicine Clinic, for example, may obtain a prescription for testosterone therapy if his doctor believes it is medically warranted. Like J.C., this hypothetical adolescent patient has a male gender identity. Like J.C., his doctor believes testosterone therapy is medically necessary to treat a serious medical condition. While the University will permit

---

[1] *See* Najiba Lahlou, et al., "Pharmacokinetics and Pharmacodynamics of GnRH Agonists: Clinical Implications in Pediatrics," JOURNAL OF PEDIATRIC ENDOCRINOLOGY AND METABOLISM 13, 723-737 (2000) ("Since 1981, GnRH agonist administration has been the treatment of choice for central precocious puberty."), https://doi.org/10.1515/JPEM.2000.13.S1.723 (last accessed December 7, 2023).

[2] *See* Maria Vogiatzi, et al., "Testosterone Use in Adolescent Males: Current Practice and Unmet Needs," 5 J ENDOCR SOC. 1 (Jan 1, 2021) ("Testosterone replacement therapy (TRT) is routinely prescribed in adolescent males with constitutional delay of growth and puberty (CDGP) or hypogonadism."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7705876/ (last accessed December 7, 2023); Marianna Rita Stancampiano, et al., "Testosterone Therapy in Adolescent Boys: The Need for a Structured Approach," HORM RES PAEDIATR 92 (4): 215–228 (March 2020) ("Testosterone therapy is a cornerstone of the management of hypogonadism in boys."), https://karger.com/hrp/article/92/4/215/162935/Testosterone-Therapy-in-Adolescent-Boys-The-Need (last accessed December 7, 2023.

its doctors to prescribe testosterone therapy in those cases, it will not do so in J.C.'s case because J.C. *was assigned female at birth*. In other words, J.C. is denied this treatment *because of his sex. See Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) (upholding preliminary injunction of Arkansas law prohibiting gender-transition treatment for minors because the aw "discriminates on the basis of sex").

The Eighth Circuit's affirmance of a preliminary injunction in *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) demonstrates Plaintiffs' likelihood of success of the merits in this case. *Brandt* involved Arkansas legislation prohibiting healthcare professionals from "provid[ing] gender transition procedures to any individual under eighteen (18) years of age," including "puberty-blocking drugs, cross-sex hormones, or other mechanisms to promote the development of feminizing or masculinizing features in the opposite biological sex." *Id.* at 668. Transgender minors and their parents challenged the law as contrary to the Equal Protection Clause of the Fourteenth Amendment because it discriminates on the basis of sex and transgender status. *Id.* Affirming the district court's preliminary injunction, the Eighth Circuit concluded that Plaintiffs were likely to succeed on the merits of their claim:

> [U]nder the Act, medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex. A minor born as a male may be prescribed testosterone or have breast tissue surgically removed, for example, but a minor born as a female is not permitted to seek the same medical treatment. Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [the] Act discriminates on the basis of sex.

*Id.* at 669. The same reasoning applies here. The University refuses to provide puberty-delaying medication and testosterone therapy to K.J. and J.C., respectively, even though it does provide that very same medication to cisgender minors. If anything, Plaintiffs have a *greater* chance of succeeding on the merits of in this case than the plaintiffs in *Brandt* because Plaintiffs are only challenging a University *policy* on statutory grounds whereas the *Brandt* plaintiffs were challenging state *legislation* on

9

constitutional grounds. *See Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (holding that a "more rigorous standard" is required to enjoin duly enacted legislation as compared to a mere government policy).

While other district court decisions within and without the Eighth Circuit are not binding on this Court, they are instructive. In *Scott v. St. Louis Univ. Hosp.*, 600 F. Supp. 3d 956, 963 (E.D. Mo. 2022), an employee of St. Louis University Hospital sued her employer under the ACA and other federal statutes for refusing to provide insurance coverage for her transgender son's gender-affirming medical treatment. Denying the University's motion to dismiss in part, the district court concluded that the plaintiff had stated a claim for sex discrimination under § 1557 of the ACA by alleging that her employer-provided insurance plan "provides less comprehensive coverage to her son [than to cisgender children] because he is transgender." *Id.* at 965; *see also C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, 536 F. Supp. 3d 791, 793 (W.D. Wash. 2021) (denying insurer's motion to dismiss ACA claim for sex discrimination based on denial of insurance coverage for gender-affirming care); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 982 (W.D. Wis. 2018) (granting plaintiff's motion for summary judgment that state's exclusion of gender-affirming care from its employee insurance coverage violated ACA's prohibition against sex discrimination in health program).

Because the University would have continued to treat J.C. and K.J. with the same medications they have been receiving for more than a year if only they were cisgender instead of transgender, Plaintiffs have more than a fair chance of success on the merits of the ACA claims for sex discrimination.

### B. The University's policy also discriminates based on disability.

Section 1557 of the Affordable Care Act also prohibits federally funded health programs from "denying benefits to, or subjecting to discrimination, an individual 'on [a] ground prohibited

10

Case 2:23-cv-04216-MDH   Document 17   Filed 01/04/24   Page 14 of 19

under … section 794 of Title 29." 42 U.S.C. § 18116(a). More commonly known as Section 504 of the Rehabilitation Act of 1973, section 794 of Title 29 prohibits discrimination against an "individual with a disability … *solely by reason of her or his disability* … as defined in section 705(20) of this title." 29 U.S.C. § 794 (emphasis added). Under Section 705(20) of Title 29, "individual with a disability" means "any person who has a disability as defined in section 12102 of Title 42," also known as the Americans with Disabilities Act ("ADA"), which in turn defines "disability" as:

(A)  a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)  a record of such an impairment; or

(C)  being regarded as having such an impairment.

42 U.S.C. § 12102(1). Consequently, a health program violates § 1557 of the ACA if it denies benefits to or otherwise discriminates against an individual *solely by reason of* such individual having (or having a record of having, or being regarded as having) a physical or mental impairment that substantially limits one or more major life activities of such individual.

Both Plaintiffs have been diagnosed with gender dysphoria by their University doctors. Both Plaintiffs received ongoing medical treatment for gender dysphoria from their University doctors for more than a year before August 28, 2023. Neither the University nor its doctors are prohibited from continuing to provide Plaintiffs treatment for gender dysphoria after August 28, 2023 under SB 49. Nonetheless, the University has adopted a policy prohibiting its doctors from continuing Plaintiffs' treatment since August 28, 2023. The University's policy of denying legally authorized treatment for gender dysphoria violates the ACA if (1) if the University is withholding treatment solely because of Plaintiffs gender dysphoria and (2) gender dysphoria is a disability.

There is little question that the University is denying treatment to J.C. and K.J. solely because of they have gender dysphoria rather than (or, in K.J.'s cause, in addition to) precocious puberty or some other physical impairment the University does not disfavor. As noted above, University

11

doctors may still prescribe testosterone therapy for minors with constitutional delay of growth and puberty (CDGP) or hypogonadism, and they may still prescribe GnRH agonists for minors with precocious puberty. As a matter of policy, however, University doctors may not prescribe these same medications to minors with gender dysphoria. The discriminatory intent behind the University's policy is all the more apparent in K.J.'s case because he was diagnosed with (and originally prescribed a GnRH agonist for) *both* gender dysphoria *and* precocious puberty. If he had been diagnosed with precocious puberty alone, the University would permit his doctor to continue treatment with a GnRH agonist; yet, because K.J. *also* has gender dysphoria, the University will not let his doctor administer or refill it his medication *even to treat his precocious puberty*. Consequently, the University is discriminating against Plaintiffs because of their gender dysphoria.

The only remaining question is whether gender dysphoria is a "disability" within the meaning of the ADA, the Rehabilitation Act, and § 1557 of the ACA. While the Eighth Circuit has not yet addressed this question, the Fourth Circuit has addressed it and answered in the affirmative. *See Williams v. Kincaid*, 45 F.4th 759, 774 (4th Cir. 2022), cert. denied, 143 S. Ct. 2414 (2023). In *Williams,* the plaintiff was a transgender female inmate in a county jail who had been receiving hormone replacement therapy (HRT) to treat gender dysphoria for 15 years before her incarceration. *Id.* at 763-64. Although she was initially placed in women's housing, jail officials moved her to men's housing when they learned she was transgender, refused to administer her prescription for HRT for several weeks, and subjected her to aggressive bodily searches by male guards that caused physical injury *Id.* at 764. Williams sued her jailers under the ADA and the Rehabilitation Act among other grounds, but her claims were dismissed by the district court. *Id.* at 765.

While the defendants conceded on appeal that gender dysphoria was a physical or mental impairment substantially limiting one or more major life activity, they argued that William's condition fell within the ADA's express exclusion of "transvestism, transsexualism, pedophilia,

12

exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, [and] other sexual behavior disorders" from the definition of "disability." *Id.* at 766 (quoting 42 U.S.C. § 12211(b)). The Fourth Circuit disagreed for two reasons. First, the court observed that "gender identity disorders" is an outdated term from the then-current Third Edition of the American Psychiatric Association's ("APA") Diagnostic and Statistical Manual ("DSM III") when the ADA was enacted in 1990. *Id.* at 767. The APA removed "gender identity disorders" from the Fifth Edition of the DSM in 2013 ("DSM-V") and added a new diagnosis of "gender dysphoria," which is characterized by "clinically significant distress felt by *some* individuals who experience an incongruity between their gender identity and assigned sex." *Id.* Because "being trans alone cannot sustain a diagnosis of gender dysphoria under the DSM-V, as it could for a diagnosis of gender identity disorder under earlier versions of the DSM," the Fourth Circuit concluded that "gender dysphoria" is not a "gender identity disorder" within the ADA's statutory exclusion. *Id.* at 768-69 ("Put simply, while the older DSM pathologized the very existence of transgender people, the recent DSM-5's diagnosis of gender dysphoria takes as a given that being transgender is not a disability and affirms that a transgender person's medical needs are just as deserving of treatment and protection as anyone else's.").

Second, "even if gender dysphoria and gender identity disorder were not categorically distinct," the Fourth Circuit concluded that Williams's "gender dysphoria nevertheless falls within the ADA's safe harbor for gender identity disorders *resulting from physical impairments*." *Id.* at 770 (cleaned up). Although the ADA does not define "physical impairments," the Fourt Circuit looked to regulations promulgated by the EEOC, which "defin[e] the term expansively as 'any physiological disorder or condition ... affecting one or more body systems, such as neurological ... and endocrine.'" *Id.* at 770 (quoting 28 C.F.R. § 35.108(b)(1)(i)). Because Williams alleged that her medical treatment for gender dysphoria "consisted primarily of a hormone therapy, which she used to effectively

13

manage and alleviate the gender dysphoria she experienced" for the last fifteen years, the Fourth Circuit concluded that she had sufficiently pleaded a "physical impairment." *Id.* at 770-71.

The same is true in this case. K.J. alleges that his gender dysphoria caused him to self-harm in first grade. Compl. ¶104. J.C. alleges that the onset of menstruation and breast development during puberty made his body seem even more alien and caused severe anxiety and depression. *Id.* ¶ 78. Both Plaintiffs allege that discontinuing their medical treatment for gender dysphoria will cause "irreparable *physical* and psychological harm." *Id.* ¶157. J.C. alleges he "will start to lose the secondary sex characteristics … such as facial hair and increased upper body strength…." *Id.* ¶152. K.J. alleges he will "begin menstruating and developing breasts." *Id.* ¶154-55. In both cases, "the sudden development of [or reversion to] female characteristics will cause K.J. [and J.C.] severe emotional and *physical* distress." *Id.* ¶156. In short both Plaintiffs have alleged "physical impairments" that substantially affect their endocrine and reproductive systems." As the Fourth Circuit has concluded, their gender dysphoria constitutes a "disability" within the meaning of the ADA and, therefore, the ACA. Consequently, Plaintiffs have more than a fair chance of success on the merits of their claim for disability discrimination.

### III. Both the balance of equities and the public interest favor granting preliminary injunctive relief in this case.

The final two *Dataphase* factors—the balance of equities and the public interest— "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). In balancing the equities, the Court must weigh "the threat of irreparable harm" shown by the movant against "the injury that granting the injunction will inflict on other parties litigant." *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020).

Here, the threat of irreparable harm to Plaintiffs substantially outweighs any injury preliminary injunctive relief could possibly inflict on the University. If an injunction does not issue,

14

Plaintiffs will no longer have access to *legally authorized* medical treatment the University's own doctors (a) have determined to be medically necessary for Plaintiffs' physical and mental health, and (b) have already provided Plaintiffs for more than a year. Moreover, their bodies will develop secondary sex characteristics that are incongruous with their gender identity, exacerbating the gender dysphoria for which they sought medical treatment from the University in the first place. If an injunction does issue, by contrast, the University will merely have to continue providing the same medical care it has been providing these Plaintiffs for over a year already. This Court should preserve the status quo by granting a preliminary injunction until it can fully resolve Plaintiffs' claims on the merits at trial

## REQUEST FOR HEARING

Plaintiffs respectfully request a hearing on their Motion for Preliminary Injunction to present evidence on the threat of irreparable harm to Plaintiffs and their likelihood of success on the merits of their ACA claims.

Respectfully submitted,

**TGH Litigation LLC**

*/s/ J. Andrew Hirth*
J. Andrew Hirth, #57807MO
28 N. Eighth St., Suite 317
Columbia, MO 65201
Andy@TGHLitigation.com
Phone: 573 256 2850
Fax: 573 213 2201

Attorneys for Plaintiff